UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY RABINOWITZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMTRUST FINANCIAL SERVICES, INC., BARRY D. ZYSKIND, DONALD T. DECARLO, SUSAN C. FISCH, ABRAHAM GULKOWITZ, GEORGE KARFUNKEL, LEAH KARFUNKEL, RAUL RIVERA, EVERGREEN PARENT, L.P., EVERGREEN MERGER SUB, INC., and STONE POINT CAPITAL LLC,<br><br>Defendants, | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stanley Rabinowitz ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1. Plaintiff brings this class action on behalf of the public stockholders of AmTrust Financial Services, Inc. ("AmTrust" or the "Company") against AmTrust's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Stone Point Capital LLC through its affiliate Evergreen Parent, L.P. ("Evergreen") and its wholly-owned subsidiary

1

Evergreen Merger Sub, Inc. ("Merger Sub," and collectively with Evergreen and Stone Point Capital LLC, "Stone Point").

2. Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading definitive proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on May 4, 2018. The Proxy recommends that AmTrust stockholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby AmTrust is acquired by Stone Point. The Proposed Transaction was first disclosed on March 1, 2018, when AmTrust and Stone Point announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Stone Point will acquire all of the outstanding shares of common stock of AmTrust (not owned by Barry D. Zyskind, George Karfunkel, Leah Karfunkel and certain of their affiliates and related parties (the "Karfunkel-Zyskind Family")) for $13.50 per share (the "Merger Consideration"). The Karfunkel-Zyskind Family has agreed to rollover their AmTrust shares into ownership interests in Evergreen.

3. The Proposed Transaction is not fair to AmTrust's stockholders. The Karfunkel-Zyskind Family exerted its control over the Company to ensure that the Special Committee agreed to the Proposed Transaction. And while the Proposed Transaction values the Company at approximately $2.7 billion, the Special Committee's financial advisor, Deutsche Bank Securities, Inc. ("Deutsche Bank"), calculated an implied per share equity value as high as $19.51.

4. Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process and the financial projections prepared by AmTrust management.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin

Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to AmTrust's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

## PARTIES

6. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of AmTrust.

7. Defendant AmTrust is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 59 Maiden Lane, 43rd Floor, New York, New York 10038. AmTrust common stock trades on NASDAQ under the ticker symbol "AFSI."

8. Defendant Barry D. Zyskind has been President and CEO of the Company since 2000, Chairman of the Board of Directors since 2016 and a director of the Company since 1998.

9. Defendant Donald T. DeCarlo has been a director of the Company since 2006. DeCarlo was a member of the Special Committee.

10. Defendant Susan C. Fisch has been a director of the Company since 2010. Fisch was a member of the Special Committee.

11. Defendant Abraham Gulkowitz has been a director of the Company since 2006. Gulkowitz was a member of the Special Committee.

12. Defendant George Karfunkel has been a director of the Company since 1998.

13. Defendant Leah Karfunkel has been a director of the Company since 2016.

14. Defendant Raul Rivera has been a director of the Company since 2016. Rivera was

3

a member of the Special Committee.

15. Defendants Zyskind, DeCarlo, Fish, Gulkowitz, G. Karfunkel, L. Karfunkel and Rivera are collectively referred to herein as the "Board." Defendants DeCarlo, Fisch, Gulkowitz and Rivera are collectively referred to herein as the "Special Committee."

16. Defendant Stone Point Capital LLC is a private equity firm that invests in financial services businesses. Stone Point Capital LLC is based in Greenwich, Connecticut and New York, New York.

17. Defendant Evergreen is a Delaware limited partnership formed by private equity funds managed by Stone Point.

18. Defendant Merger Sub is a Delaware corporation and is a wholly owned subsidiary of Evergreen.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

20. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

21. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) AmTrust maintains its primary place of business in this District; (iii) a

substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of AmTrust common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

23. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. As of February 23, 2018, AmTrust had approximately 196 million shares of common stock outstanding and 5.3 million shares of preferred stock outstanding.

(b) Questions of law and fact are common to the Class, including, inter alia, the following:

  (i) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

  (ii) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

  (iii) Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

5

    (iv)  whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

  (c)  Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

  (d)  Plaintiff's claims are typical of those of the other members of the Class.

  (e)  Plaintiff has no interests that are adverse to the Class.

  (f)  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

  (g)  Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

  (h)  Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. The Karfunkel-Zyskind Family Capitalizes on AmTrust's Difficult Year

24.  AmTrust was acquired by the Karfunkel-Zyskind Family in 1998 and went public in 2006. Over the next decade, the Company's stock price rose as the Company grew:



25.     But as the chart above demonstrates, 2016 began a turbulent period for the Company. On November 10, 2016, in a Form NT 10-Q filed with the SEC, the Company disclosed that it had discovered deficiencies in its internal controls. The Company expanded on this in a Form 8-K filed with the SEC on February 27, 2017, noting that it had identified material weaknesses in its internal controls as of the end of 2016. That day, its stock fell 19% to close at $22.34 per share. But on March 16, 2017 the Company stated in a Form 8-K that its financial statements for fiscal years 2014 and 2015, for each of the four quarters of 2015, and the first three quarters of 2016, could not be relied on and would need to be restated. The next day, its stock fell 18.6% to close at $17.58 per share.

26.     This was just the start of a string of bad news for AmTrust. A MarketWatch article from April 4, 2017, entitled "AmTrust revises past earnings due to errors," noted that Barron's questioned whether AmTrust had overstated profits by having inadequate reserves for losses.[1] The Wall Street Journal reported on April 11, 2017 that the Company was under investigation by the

---

[1] Michael Rapoport, "AmTrust revises past earnings due to errors," MarketWatch, April 4, 2017, *available at* https://www.marketwatch.com/story/amtrust-revises-past-earnings-due-to-errors-2017-04-04.

7

SEC, something AmTrust did not confirm until May 2018.[2] That day, AmTrust's stock fell 18.9% to close at $15.30 per share.

27.     The next month, the Company issued 24,096,384 shares of AmTrust common stock to members of the Karfunkel-Zyskind Family, for $300,000,000. Those funds were not enough to help the Company deal with certain claims. In June 2017, AmTrust sold shares it held in National General Holdings Corp for over $211 million. In July 2017, AmTrust entered into an agreement with a reinsurer whereby the reinsurer would cover $1 billion in claims. In addition, AmTrust agreed to sell its personal lines policy management system to National General Holdings Corp for $200 million and agreed to sell 51% of its stake in its U.S. fee businesses for $950 million.

28.     Despite its best efforts, the Company could not stop the decline of its stock price. By the end of 2017, its stock was trading at $10.07 per share, a 63% decline from its closing price of $27.27 on the first trading day of 2017.

29.     On March 1, 2018, the Board entered into the Merger Agreement with Stone Point and the Karfunkel-Zyskind Family.

30.     When the Company issued $300,000,000 of AmTrust common stock to members of the Karfunkel-Zyskind Family, they held approximately 44% of all the Company's outstanding common stock. As of December 1, 2017, the Karfunkel-Zyskind Family held approximately 42.7% of all the Company's outstanding common stock. In filings with the SEC, AmTrust admitted that the Karfunkel-Zyskind Family were the controlling stockholders of the Company and had the ability to control the business.

31.     The Karfunkel-Zyskind Family exerted this control to ensure that the Company

---

[2] Mark Maremont, Leslie Scism and Michael Rapoport, "Secret Recordings Play Role in SEC Probe of Insurer AmTrust," Wall Street Journal, April 11, 2017, *available at* https://www.wsj.com/articles/secret-recordings-play-role-in-sec-probe-of-insurer-amtrust-1491903011?mod=article_inline.

went private. For example, Stone Point was a potential purchaser of AmTrust's U.S. fee businesses. While that process was ongoing, Stone Point contacted Zyskind about working together on a going private transaction. There's no indication in the Proxy that Zyskind informed the Board of this conversation. But on November 8, 2017, Zyskind "raised the possibility" of a going private transaction. It was not until a week later that Zyskind informed the Board that Stone Point was interested in partnering with the Karfunkel-Zyskind Family on a going private transaction.

32. When Stone Point and the Karfunkel-Zyskind Family made their first proposal to take AmTrust private, the Karfunkel-Zyskind Family made clear that they would not support a different transaction. This was made public to stockholders via an amended Schedule 13D on January 10, 2018. The Special Committee noted the Company's "limited potential alternatives" because the Karfunkel-Zyskind Family refused to consider a different kind of transaction.

33. In addition, the process leading up to the Merger Agreement was tainted by various conflicts of interest. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BoA Merrill Lynch") was the Company's financial advisor during the process to consider sale of the Company's U.S. fee businesses. BoA Merrill Lynch later was engaged by the Company in relation to the Proposed Transaction, but it is not clear who, exactly, was advised by BoA Merrill Lynch, as the Special Committee had their own financial advisor. Furthermore, the Special Committee discussed various lawsuits brought on behalf of the Company, including those where at least one member of the Special Committee was a named defendant in the case. The discussions considered the impact of those cases on the value of the Company, and any payments made by defendants in a derivative lawsuit would go to the Company.

34. Even if the Proposed Transaction were the product of a fair sales process, the

9

Merger Consideration fails to adequately value the Company. Arca Capital, one of AmTrust's larger shareholders, wrote an article on Seeking Alpha on February 14, 2018, entitled "Why Stone Point Capital Offer Is Too Low?", in which it states: "We can easily value AFSI to a range of $15-$19 per share given management's guidance following the announced sale of a portion of their U.S. fee businesses."[3] They further stated:

> AFSI maintains a competitive advantage on the expense side of their operations within the small commercial Workers Comp business through their IT platform, as well as being a leader in the Warranty business. Employment payrolls continue to grow which will allow the Workers Comp market to expand, and we believe more companies will utilize Warranty products and services to enhance revenues. AFSI expects that it will generate an ROTE of 12% to 15% following the sale of the fee business, and utilizing our 2018E TBVPS estimate of $12.54, generates valuation ranges of $15 (at 1.2x TBVPS) to $19 (at 1.5x TBVPS) (table 1). However, we believe that Stone Point is expecting higher tangible book value growth and/or earnings growth, otherwise we doubt they would have entered into this transaction just to get to management's expectations.[4]

35.     The analyses of the Company's own financial advisor illustrate that the Merger Consideration may not be high enough. For example, Deutsche Bank's *Dividend Discount Analysis* implied a per share equity value as high as $15.60, while the *Precedent Transactions Analysis* implied a per share equity value as high as $19.51.

### B. The Materially Incomplete and Misleading Proxy

36.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to AmTrust stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

37.     On May 4, 2018, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary

---

[3] "Why Stone Point Capital Offer Is Too Low?," Seeking Alpha, February 14, 2018, *available at* https://seekingalpha.com/article/4146613-stone-point-capital-offer-low
[4] *Id*.

for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, AmTrust stockholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### *Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

38. The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of Deutsche Bank's fairness opinion, Deutsche Bank reviewed "certain internal analyses, financial forecasts and other information relating to the Company prepared by the management of the Company . . . and certain financial forecasts relating to the Company prepared by the Company upon instruction from the Special Committee." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that AmTrust's management provided to the Special Committee and Deutsche Bank.

39. Notably, Defendants failed to disclose the Special Committee Case and Downside Case financial projections for fiscal years 2017 to 2022 for shareholders' equity, BVPS, capital management, shares outstanding, pre-tax income, after-tax net income, operating income adjustments, after-tax operating income, net investment income, service and fee income, corporate and other revenue, other expenses, net earned premiums, loss and LAE ratio, and expense ratio. Defendants also failed to disclose the projected total assets for fiscal years 2017 to 2022 under the Special Committee Case, Case 1, Case 2 and Downside Case projections. This omitted information is necessary for AmTrust stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

11

*Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

40. The Proxy also fails to disclose material information concerning the sales process. For example, the Proxy does not make clear that the $300 million private placement of private stock in May 2017 was made to members of the Karfunkel-Zyskind Family, whether the Board approved that private placement, or whether and how that private placement impacted the percentage of outstanding AmTrust common stock held by the Karfunkel-Zyskind Family.

41. The Proxy does not disclose whether Defendant Zyskind informed the independent members of the Board of Stone Point's indication of interest in a going private transaction when it was made in September 2017 or when Defendant Zyskind suggested a potential going private transaction at the Board meeting on November 8, 2017. While Defendant Zyskind informed the Board of Stone Point's interest in a going private transaction on November 16, 2017, it is unclear whether that included information about conducting a transaction with the Karfunkel-Zyskind Family.

42. The Proxy mentions that there were "inquiries from other financial sponsor parties regarding a potential going-private" transaction as of December 2017. But the Proxy does not disclose how many inquiries were received, when those inquiries were received, how the Board treated those inquiries and whether the Karfunkel-Zyskind Family informed the Board that they would not vote in favor of a transaction with the parties.

43. The Proxy fails to disclose whether the Board was aware of the meeting between Stone Point and the Karfunkel-Zyskind Family and the ratings agency, and whether such meeting was approved by the Board before it took place.

44. According to the Proxy, the Special Committee suggested resolutions, approved by the Board on January 9, 2018, expanding its authority to evaluate, negotiate and determine whether

to accept a proposal from the Karfunkel-Zyskind Family. The Proxy does not disclose whether the Special Committee discussed requesting authority to conduct an auction process or consider other strategic alternatives.

45. The Proxy discusses various meetings of the Special Committee that concerned derivative and class action lawsuits, specifically a derivative lawsuit brought by Cambridge Retirement System, and their impact on the valuation of the Company. However, no other information was provided about these cases, their impact on the Company's value, and whether they impacted the financial projections Deutsche Bank relied on for their analyses.

46. The Proxy notes that in a meeting on February 7, 2018, the Special Committee received a report on "feedback received from certain large holders of shares of common stock related to the" Proposed Transaction. The Proxy does not disclose whether that feedback was positive or negative, whether the shareholders approved of such a transaction, or any other details concerning that feedback. This information is important for smaller shareholders to know, because if large shareholders were opposed to the Proposed Transaction or influenced the terms of the Merger Agreement in any way, it may impact their vote.

47. While the Proxy indicates that Deutsche Bank or its affiliates provided services to Stone Point and the Company in the past, it does not disclose the amount of compensation received by Deutsche Bank or its affiliates for those services.

48. The Proxy states that BoA Merrill Lynch was engaged by the Company concerning the Proposed Transaction. But the Proxy does not disclose the parameters of the engagement, who specifically BoA Merrill Lynch was advising, the number of parties that BoA Merrill Lynch engaged in discussions with concerning a potential transaction, or the analyses conducted by BoA Merrill Lynch. The Proxy also fails to disclose the timing and nature of discussions between a BoA

Merrill Lynch affiliate and the Karfunkel-Zyskind Family concerning debt financing for the Proposed Transaction. In addition, the Proxy fails to disclose details concerning BoA Merrill Lynch's participation in coverage activities with Stone Point and the Karfunkel-Zyskind Family by a senior member of the team advising the Company, that senior member's relationship with Stone Point and its senior principals, and the consideration of the Board of this senior member's relationship as well as the fact that the member's spouse is a principal of Stone Point.

49. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, AmTrust stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

50. In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

51. Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

52. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's

stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

53. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54. Defendants have filed the Proxy with the SEC with the intention of soliciting AmTrust stockholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

55. In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of AmTrust, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

56. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

57. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; and (ii) the sales process.

58. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

59. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

60. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of AmTrust within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of AmTrust and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

64. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these

defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C. In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

D. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 21, 2018

Respectfully submitted,

By: *S/ Shane Rowley*
Shane T. Rowley
Email: srowley@rowleylawpllc.com
Danielle Rowland Lindahl
Email: drl@rowleylawpllc.com
**ROWLEY LAW PLLC**
50 Main Street, Suite 1000
White Plains, New York 10606
Tel: (914) 400-1920
Fax: (914) 301-3514

*Attorneys for Plaintiff*